Thomas Okay, Mr. Williamson, whenever you're ready. Good morning, good morning. May it please the court, the interpretation of 18 U.S.C. section 1030A5A proposed by the government and adopted by the district court in this case would criminalize a vast array of everyday workplace conduct. An example from this case illustrates how. On December 3rd, 2011, Michael Thomas did something that he did every month. He deleted backup files from ClickMotive's backup server. As the IT administrator, Mr. Thomas was in charge of backups at ClickMotive, including deciding when and how backups were created and deleted. These backups had been created automatically according to a schedule that Mr. Thomas himself had set. And typically, they would have been deleted automatically after a period of time, again, a time period selected by Mr. Thomas. None of this was dictated by ClickMotive. The only direction the company gave Mr. Thomas regarding his backup duties was a single line in his employment agreement that said, perform backups. The company had no data retention policy that stated for how long backups must be kept. The closest thing the government could point to was policy from the employee handbook vaguely recalled by the ClickMotive CTO, saying, quote, or rather containing, quote, plenty of policies against the destruction of valuable things. The handbook itself was never introduced at trial. On this particular day, Mr. Thomas deleted all of the backup files on the backup server. These were not all of the backups that ClickMotive had. The systems that had been backed up maintained their own backups locally. ClickMotive had never once needed to restore data from these backups, and after Mr. Thomas's departure, they had no, they encountered no need for them. Most importantly, ClickMotive had never clearly limited Mr. Thomas's duties or authority regarding how to maintain backups. Though all of the trial- If your client had put a virus in his employer's computer system, would that violate the statute? Would it violate 1030A-5A, Your Honor? Yes, I believe it would under this court's opinion in U.S. v. Phillips, which prohibits essentially making an unintended use of a computer system. Now, an unintended use under Phillips is essentially causing the computer to do something or causing a program to do something that it wasn't intended to do. So in Phillips, that was using a brute force hacking attack to essentially throw credentials at a computer until it found, until it authorized the user. The rule is derived from a Second Circuit case, U.S. v. Morris, where the defendant had done essentially what you're saying, had exploited vulnerabilities in computer programs in order to get access that they weren't intended to have. In this case, though the government cites the intended use standard, that's not what happened in this case. Mr. Thomas used the ordinary functions of the computer to delete files that he had. It is admitted under, even by the government, that at least under some circumstances, he had the authority to delete. He didn't use... The indictment charged a valid offense, correct? In what sense do you mean? Well, I'm asking you. Did you move to dismiss the indictment saying it didn't charge a crime? Your Honor, I, the indictment charged, or rather the indictment did allege a valid offense. However, on the facts presented at trial, Your Honor, there is no, our argument is that there is no proof that Mr. Thomas... Well, you're saying there is no evidence for the jury to have found what it did. That's right, Your Honor. But you didn't object to the indictment, and you didn't ask for any jury instructions that say, for example, access, authorization equals access. We did ask for a jury instruction on the topic of authorization, Your Honor. We asked for... But you haven't presented to us that as an error. We did not raise it in our opening brief, Your Honor. Okay. So what we've got here is, were you able to make the argument you're making to us now, to the jury? Did they hear it and disbelieve it? And when I read the record, you did. You put your one witness on, the expert Eastman. Was that his name? Eastman. Eastman. And he made just the argument you're making now, which is that Mr. Thomas was, in the closing argument, he had the keys to the kingdom. All he was doing was wiping out stuff that was bad for the company. Sometimes you've got to wipe it all out. But the jury didn't believe him. And he was cross-examined, and the cross-examination hit home. Your Honor, our argument here is not that Mr. Thomas, that the evidence shows that Mr. Thomas did things that he believed were good for click motive. Rather, it's that as a matter of law, given Mr. Thomas's... As soon as you say, as a matter of law, I don't see how you're arguing a sufficiency issue. You should have asked for a jury instruction that said, authorization has the meaning I'm telling you it has, which is if the man has access, an A5 crime can't occur. He's an insider. It's only aimed at outsiders. And then the jury asked these various notes about what impairment was, and you guys said, we'll use the instructions you've already given them. So it seems like the government was free to argue he didn't have permission, and they put on the company people, and admittedly no manual and all that, but they basically said he had to benefit the company. So jury hears that. Jury hears his admissions to the FBI agent that he wanted to make troubles for his successor. It's just a pure jury question. Did he have permission, or didn't he? And you put your expert on to say, yeah, he had the keys to the kingdom. That was permission. They just didn't believe it. Your Honor, the jury did wrestle with this question of authorization, asked the court a couple of times to further define authorization. We had asked the court to define authorization according to the Eighth Circuit's model jury instruction. And then you could have presented that to us. I want to know, sort of cut to the core of this, this whole case turns on the phrase without authorization, doesn't it? That's right, Your Honor. All right. How can you read without authorization to not apply to intentional creation of damage? Your Honor, as we argue in our brief, the concept of damage within the meaning of the CFAA applies to any deletion or alteration of data. That would include activity that everyone who uses a computer does every day. You're leaving out the concept of intent. That's right, Your Honor. When one deletes an email from their inbox, they are intentionally causing damage. But they're not intentionally creating damage. They are, Your Honor, because damage is defined as any impairment to the availability of data. And when they delete that email, that email is no longer available. The availability of it is impaired. And courts have accepted that there is authorized damage and unauthorized damage. If damage was necessarily unauthorized or necessarily construed as a violation of the statute, then there would be no point in Congress having included the term without authorization. It could have simply said it is a violation of this statute to intentionally cause damage to a protected computer. But the point is that some users are authorized to damage computers, damage data, within the meaning of the statute. That's a stretch of the term damage. Well, unfortunately, it's unfortunate for my client, Your Honor, that Congress chose a term damage that has loaded connotations for this concept. But, in fact, Your Honor, the definition of damage is merely about the impairment to the accessibility of data or a system. But this case looks like a picture-perfect case why there are limitations because you put on the expert that tried to say it looks like damage but it actually helped. This is exactly what the guy was hired to do. He had unlimited access, and over the weekend he ran into problems. He wiped the virtual machine because sometimes that's all you can do. Jury heard that. But then the jury also heard no. He wanted to mess up his successor, and we can infer guilty knowledge because he flees to Brazil. And email backups gone, this gone, that gone, and the jury just had to make the decision about was this harm or was this authorized IT usage. But, Your Honor, to the extent that the jury's verdict was based on that conclusion, then it was improper because harm is not an element of the offense itself. Damage equals impairment, harm. But, again, Your Honor, courts have consistently acknowledged that damage is not necessarily harm, that damage merely means the impairment of the availability of data. And there is authorized damage and unauthorized damage. I'm trying to understand your reading of the statute. Tell me what, two questions, what does the statute cover in your mind? Give me an example. And, two, is it your view that no insider can be guilty under this provision? No, that's not our position, Your Honor. Our position is that as stated best, I think, by Congress in the legislative history in the Senate report on the most recent version of the Computer Fraud and Abuse Act, the distinction is that those who intentionally damage a system without authority should be punished regardless of whether they are authorized users. In other words, you can be authorized to access data on a computer, but not to damage it, not to delete any files, not to modify any settings. That is a clear line that Congress drew. Here's, like, an employee who's not an IT person who just uses their e-mail. That would be someone who doesn't have authorization to go in and do all this stuff to the whole system. That's right, Your Honor. They wouldn't have authorization to delete any file from a server of ClickMotives. So your interpretation depends on saying once you have, for someone like your client who's in IT, who has all this authorization, you're basically saying they can't be prosecuted, as I understand your theory. I'm not saying that, Your Honor. Although applying the rule adopted by various circuits, including the Ninth, Second, and Fourth, that would be a reasonable conclusion. What cases are you talking about that rely on this particular, the 1030A5A? Your Honor, none of those cases are specifically 1030A5A. They're access cases, right? They are, Your Honor. However, the term or each of the prohibitions is about access. One is about access without authorization, and one is about damage without authorization. And Congress gave no indication in the text of the statute that the term without authorization is intended to be construed differently in the access and damage cases. In fact, when the Ninth Circuit first drew this distinction and said, we're not going to follow the Seventh Circuit's rule that doing something harmful or contrary to the interests of your employer is necessarily a violation of authorization, that Seventh Circuit case they were distinguishing was an A5A case. That's International Airport Centers v. Citroen. And they didn't distinguish it on the basis that access and damage cases are entirely different. But it makes sense that accessing is saying you don't have authority to even get into this system. Just by accessing it, it's a crime. Here, no one's disputing that he could access it all day long. The issue was he couldn't intentionally cause damage. But, Your Honor, it's admitted. I mean, the court itself pointed out that Mr. Thomas was permitted to delete data, and deleting data is definitionally damage under the view that you said. But you can delete to do something that is not damage, or you can delete with the intent of causing damage. Damage – I'm sorry, Your Honor, I didn't mean to – No, that's – Damage is defined as deleting data. Deleting data is necessarily damage under the CFAA. The only question the statute is concerned with is whether the damage is authorized. And the CFAA does not say – Whether it's authorized to use the computer in all of its aspects. But if the mens rea is to do damage, then how is that authorized? The mens rea, Your Honor, is to intentionally cause damage without authorization. Damage is not necessarily prohibited by the statute. A user can be authorized to cause damage. But under what plausible theory would he have authorization to damage the computer system by deleting the automatic commands that would perform future backups? Didn't he destroy the virtual machine? Under the same theory of authorization that in the Ninth Circuit in U.S. v. Nozzle, an employee who misappropriated trade secrets and confidential information he had access to was not found to have acted without authorization when he accessed those files for that improper purpose. The point being that the CFAA, the term without authorization, is not – What if he just wiped out all the emails in some of these executives' emails, accounts? Your Honor, the question would be the limits placed on the scope of his authorization. And this court could certainly find in some case that there was a policy that clearly limited the scope of his authorization. But in this case, Your Honor – What about just common sense? I mean, you seem to be saying that the burden is on the company to say, don't delete everyone's files that they're using. I mean, why can't the jury just look at this situation and see whether that's something that he had authority to do or not? Similarly – It seems to me common sense you can't go in and do all this stuff. Common sense, Your Honor, is not sufficient to resolve the ambiguity in a criminal statute in order to inform – Doesn't the case law say terms like authority, permission are given their common everyday meaning? Juries, that's what they should look to? They are given – And that's why courts don't often give damages defined statutorily. But some of the other terms aren't. And so the courts tell the jury just use your common everyday understanding of that term. They are given their common everyday meaning, Your Honor. And the question is what action did the employer take to grant authorization? And the employer in this case gave Mr. Thomas administrative access to these systems. Well, we've let you go a little longer, and I'm going to ask one follow-up. Just the fact the jury heard that he admitted to the FBI he was going to make life difficult for his successor. No employer would ever think to say I need to write down in writing that you can't fool with the computer system to undermine your replacement. Your Honor, the employers in United States v. Nozzle in the Ninth Circuit, United States v. Valle in the Second Circuit, WEC, Carolina Energy v. Miller in the Fourth Circuit, all specifically said to employees, you cannot do the specific thing that these employees were charged with doing, which was misappropriating trade secrets, misusing confidential information, et cetera, despite the common sense that those things were wrong and that they shouldn't use their access for those purposes. Okay. I think we have the argument. Thank you. Thank you, Your Honor. Good morning, and may it please the Court. Ben Fitzpatrick for the United States Government. Are there any pattern instructions on this 1030A5? I'm not aware of any, Your Honor, and I'm not aware of any in this circuit. To that question, Your Honor, I feel a duty of candor to note that I do believe the defendant did offer a jury instruction on without authorization, and I think it said without authorization equals without permission or authority. I would stand ready to be corrected on that. Well, that's helpful to know, but if they didn't appeal the denial of that, it sounds to me like that's their argument here. I appreciate that point, Your Honor. I just wanted to make sure that – Well, you appreciate it. What does appreciate mean? Oh, sorry. And I'm not saying that sarcastically. I may be oversimplifying this, but that would be the issue had they appealed it. Yes. But if all this before us is sufficiency, I just look at them putting the expert on. The jury heard exactly the arguments that they're making. Is that – I believe that's true, and I was actually – the opening of my argument is that this issue, this case at its core, presents a narrow facts-specific issue, and that is whether or not Click Motive gave Mr. Thomas authorization to cause the damage that he caused over that weekend in December 2011. And the evidence that was put forward to the jury proved beyond a reasonable doubt that Click Motive did not provide him with that authorization. It restricted his authority to cause damage on its systems through corporate policies, and that, therefore, Mr. Thomas was acting without authorization, and more importantly, that he knew he was acting without authorization when he took these actions. Click Motive hired Mr. Thomas, as you know, to maintain its systems and to troubleshoot problems, to keep systems online and operational. Click Motive gave him the technical capability to take a wide variety of actions on its systems to preserve the integrity and operability of that system. However, it never provided Mr. Thomas with unlimited authority to damage its systems, and that's a critical point. Rather, Click Motive defined its job responsibilities as protecting and supporting Click Motive's systems and had policies in place that prohibited destroying valuable company property and interfering with corporate processes. And to the point about the policies, it is true that they were not entered into evidence, and that is because they were not available at trial. Click Motive had been sold between the time of this incident and the time of trial, which is roughly four and a half to five years. And so certain documents were not available. However, what was made available to the jury was the testimony of senior executives from Click Motive, the CEO, the CTO, as well as Mr. Thomas's peers. And Mr. Myers, in particular, the CTO, testified about how very specific actions that Mr. Thomas took were not in alignment with policy. That was also supported by other members, I think including Mr. Gonzalez, who also testified that certain actions were inconsistent with Click Motive policy. So that explains sort of the state of what the policies were and how they were presented to the jury. Despite knowing these policies, Mr. Thomas intentionally damaged Click Motive's systems in numerous ways, including deleting over 600 backup files of customer data that Click Motive's CTO said. Well, I guess it's just it is the policy concern, which isn't necessarily our focus, but is it just an issue of severity? I mean, how do you – everyone does delete things all the time at the end of the day. And if the employer turns around and says, well, our retention policy is keep everything, are they all committing federal crimes? That's a good question, Your Honor, and there's sort of two responses. One is if you look at the statute, it requires intentional causing of damage without authorization. It intentionally requires the government to prove beyond a reasonable doubt that the individual knew that they were violating corporate policy and still went ahead and caused the damage. But I would also point out in this particular instance, the facts showed that Mr. Thomas clearly knew that he was acting without authorization, including for some of the points that were mentioned earlier, his admission to the FBI agent, as well as I would point out the turning off of the pager alert system, which I think it's reasonable to infer that that action was meant to ensure that others in the company would not receive pager alerts and know the steps he was taking over the course of a weekend when no one or very few people were in the office. So he consciously took steps to ensure that no one else is made aware of his actions, and that I think helps to show that he indeed did know that he himself was without authorization. He had also signed the employee handbook – the handbook that set forth the policy. Does the employee have to subjectively know, or is it an objective, any reasonable employee? As we understand the statute, there must both be an action without authorization, so an objective statement of this action was outside the bounds of authorization, and also that the employee or the individual must know that they were acting without authorization. So those two together, and that I think is important, Your Honor, because some of the concerns that the defendant have raised would go to issues of ambiguity or vagueness, and as courts have pointed out at this circuit and amongst others, that the application of mens rea is often very helpful in vitiating those concerns and mitigating any concern of overbreadth or overreach. There's some dicta in Phillips that this particular subsection doesn't apply to insiders. Do you have a thought on that? Yes, Your Honor. I believe that is dicta, and I believe it's erroneous. It's wrong, and it's dicta. Yes, and I say that very respectfully, but for this reason. As we set forth, A5A is a very unusual aspect of Section 1030. It applies to both insiders and to outsiders. Traditionally, in other sections, A2, A4, and A5B and A5C, without authorization is used to apply purely to outsiders. To go to the hypothetical from earlier about the insertion of the virus into their employer system, I would respectfully submit that's actually in A5A, because if the person was an insider at that time, then you have to prove that they were intentionally causing damage to their employer system. It's not A5B or A5C. So A5A is very unique in that respect, and so this goes to the question of how we define without authorization. The defendant would make an argument that it must be applied equally across all of these different statutes, but we would argue that A5A is different. The critical element here is damage, not access, and those are different. Damage is actually a defined term, and also here you're trying to encompass two separate categories of individuals. Has any one circuit really clarified this as you're describing? What do you point to as the best? I would point to actually the Senate report, Your Honor. I know the Senate report makes this point, and I don't mean it does, but is there a circuit that's really sort of gone through these elements and said A5A is distinctive? No, Your Honor, not at the appellate level, but what I could point the court to is many cases in which A5A cases have been brought against insiders, including through this court, and the defendant cited many of them, and Kwong and Shea, Stratman and Sullivan, actually not Stratman, Sullivan and Lloyd. Those were all brought against IT professionals. Two of them, actually, I think in Lloyd and in Shea, had super user credentials just like Mr. Thomas. Now, to be fair, Your Honors, in those cases, without authorization wasn't always grappled with in the way it's being grappled with here, but I think it's safe to say that many courts have looked at A5A cases involving insiders and have had no trouble affirming convictions where the individual is obviously an insider and took actions that damaged their systems, oftentimes just before they leave the company, or they set traps in place and they put a virus in the system, they corrupted malware, a time bomb, whatever, and then they get fired or they leave and the bomb goes off. So this issue about A5A has been addressed, but this court may be something of a first court to actually grapple with it in this kind of depth and detail. With that said, Your Honor, so I think the starting point here is that it is important to note that Mr. Thomas did not have unfettered or unlimited authority to damage, and one of the cases that the defendant pointed to was Nozell and to Valley from the Second Circuit and to WEC Carolina from the Fourth Circuit. Those are access cases. But I would point, Your Honors, to a different case, which we cited in our brief, to U.S. v. John. It's from this circuit. It's from 2010. And in that case, this court looked very clearly at the company policies that were in place that limited the employee's ability to misuse data that they had and cited that as one of the bases for finding that that person, in that case, exceeded authorized access. It's not a without authorization case, but it was something where this court, as many courts have done, have looked at corporate policies to understand the limitations that are imposed on employees as to what they're authorized to do and what they're unauthorized to do. So rather than look outside of the circuit, that is naturally the first case. It seems to me, and you just were addressing this point, that the divide between the two sides is he's saying that the policies have to have said you can't do this, and you seem to be saying, well, no, it's enough that the policies didn't authorize him to do this. So with looking at the statutory language, which is it? I mean, it's almost a burden question. I think our argument is that the policies here, to the specific factual issue, the policies here said very clearly you can't destroy valuable company property and interfere with the business operations. And I think when you marry that up next to the actions, which I can do if that would be helpful, it shows that his actions clearly satisfied. But let's say you had some small operation without policies, no handbooks, no policies. Couldn't there still be scenarios in which the statute's violated? I mean, take my virus example. There's no policies, but wouldn't that clearly be an intentional act to cause damage without authorization? Your Honor, the burden would be on the government to prove that the defendant knew that he was acting intentionally without authorization. I would have to say it would depend on some of the facts of the nature of that relationship, which is one of the factors that was articulated in Phillips where they talked about the nature of it. The norms. Excuse me? The norms of the institution. Yes, sir. Yes. The nature of the relationship between the user and the system owner. It would depend, and I hate to say that. But it just seems to me if you wipe out someone's entire computer, incapacitate the company for days or weeks, I mean, I guess. If the prosecutors would be able to show, if they felt they had the case to prove, that they could say there was no way this person ever knew that this was authorized, then as with any case where all the elements of the statute have been met. Had the jury believed his expert, they would have returned non-guilty. That is certainly plausible. I think the evidence here. Didn't he say sometimes you have to wipe everything out? Well, the expert also even said he wouldn't even recommend deleting the virtual machine in the way he did. The expert's testimony on their side I don't think was, as the jury found, as strong as the expert on the government side as well as all the testimony of the ClickMotive employees who talked about the steps that were taken, the damage that was caused, the weeks that were spent trying to remediate the problem, and the fact that Mr. Thomas didn't have any authority to take those particular steps in that particular instance. What, in your view, are the three most egregious steps he took? Yes, Your Honor. The deleting of the backup data, of customer data. He deleted over 600 files. Mr. Myers testified and said that was no one's responsibility to do that. And that put the company at great risk because it impinged their ability to respond from a disaster because the backups, as we all know, are the means by which you would then restore your capabilities. This industry that he worked in required that they maintain their customers' websites 99.9% of the time, and so they were under significant pressure to ensure that their systems always were operational. He also destroyed the virtual machine that created processes that would backup systems onto one server. In addition, yes, for three, Your Honor, I would also point to the pager alert, and I hone in on that one in particular because I do think that had these alerts been triggered over the weekend, the company could have intervened faster. It wouldn't have been Monday morning when they've learned of this. It could have been. Did the government offer a motive for him doing all this? Well, there was a testimony of the special agent who said that he. He said that. Yeah, okay, just it was just purely to disrupt his successor. Well, he was friends with Mr. Cain who had been terminated on Thursday, I believe. They had a very tight friendship. They were two equals in the IT department, and they had a very tight friendship. It caused Mr. Thomas to be upset with his company, frustrated with his company, and then he decided from that point forward to take steps to harm it, including going so far as that weekend to meet with Mr. Cain and another former employee and offer to help them with their cases against ClickMotive. And he even brought e-mails, and maybe I'll put this as for, for Your Honor, but he also was forwarding executives' e-mail out and gaining access to them that way, which was also according to testimony against corporate policy. So testimony about what? Did he normally work weekends? I believe there was testimony that because he was in the IT department, they were always on call available to help out issues. As I said, these systems have to be up and running all the time, and so it's natural to presume that they would be available all the time. I'm not sure about his schedules. He was out every second Friday working from home, but I presume it was a fluid schedule. What did he tell, I guess it was the agent, about his motive when it says that he was upset and wanted to cause trouble for his successor? He was upset at the company for taking this action against his close friend, and he, I guess the evidence would be reasonable to infer that he decided that he wanted to hurt his company. But did he say, I messed up the computer in order to cause this problem? I believe there's testimony that he admitted to the FBI agent that he took certain steps. He also admitted that to his friend, Mr. Cain, when they talked subsequently, and he also had the statements to the special agent in which he said, I wanted to make life harder for my successor and that I was frustrated and upset with the company. I believe all that testimony for the agent is wrapped in about one paragraph, and so I think, in fact, I can try and provide a cite to Your Honor. His discussions with the FBI agent are at the record at 2234 to 36, and I also have a note for 2253. So if I might, Your Honor, there's also the questions of ambiguity and void for vagueness. We've laid out our arguments very clearly on the briefs, but I do believe once it is established that Mr. Thomas was acting or knew he was acting without authorization, that very clearly undermines the ambiguity and the vagueness argument. Has any court at any level said this statute's void for vagueness? The closest is Drew, and the district court in California held that A2C was void for vagueness. That's different. And also in that case, Your Honor, they said it's not – A2C says it's whoever intentionally accesses a computer without authorization  And the court was very concerned about the breadth of that, and they said violations of the terms of service alone on a website shouldn't give rise to a misdemeanor liability under that statute, and they held on void for vagueness. No one else has held, and this court would be the first to hold, that A5A was void for vagueness or any aspect of A5. The same is true with respect to ambiguity. The arguments there have been with respect to the access side of the House, if you will, Your Honor, not with respect to A5A. Are you from the field office, or are you from a specialized unit in Maine Justice? I'm from a specialized unit in Maine Justice. Which unit is that? Computer Crime and Intellectual Property Section, CSIPs, Your Honor. And also with respect to vagueness, we set forth – there's many different cases where the courts have held, even if it's possible to imagine a close case, a close case doesn't – the solution for a close case is proof beyond a reasonable doubt. It's not the vagueness doctrine. And we would, of course, hold that this was not a close case at all. And with respect to ambiguity, we put forth our arguments. But Citrin, just for the Court's knowledge, it is really more of an A5B case, Your Honors, than A5A. And it's really – it requires close inspection. The argument inside of it says, essentially, if we're going to go after a disgruntled programmer of a company, you do that through A5B. And that's the point I made earlier. It's A5A where you go after the insiders. A5B is where you go after outsiders. And the Senate said that very clearly in their report. And that covers the various issues that we raised in our brief. I'd be happy to answer any further questions or go into any further detail on any of these points, if that would be helpful to Your Honors. Thank you very much. Mr. Butler? Thank you, Your Honor. I think it's important for the Court to focus on the fact that the overbreadth issues that animated the various circuit courts' decisions in the access cases are equally present here. And I'd like to present just one example, one hypothetical, where the government's interpretation would apply to conduct that no employee would believe – would have reason to believe was criminal. So imagine an office manager at a company that has a computer use policy prohibiting personal use of the Internet access to social media sites. That person browses Facebook for a few minutes every day to catch up on family matters in violation of the use policy and then deletes their browser's history in order to prevent that violation from being discovered. This is the sort of routine conduct that if the only question is, did the person know that they were doing something the company didn't want when they – or that would be contrary to the company's interest. How would that cause damage, deleting your browser history?  And the Seventh Circuit in Citroen pointed to exactly this kind of conduct. But let's say you're right about that hypothetical, that that would be a vagueness problem. How do you get around the fact that since the Johnson decision, which found vagueness on a federal statute, our court and others have said, you can't bring a vagueness challenge if the statute is clear as to you. You can't just give a hypothetical with another defendant that might pose a problem. Your Honor, my point would be that the statute isn't clear as to either of these. These are both people who had authorization to delete files on the system that they were deleting files on and who knew that they were not acting in the company's best interest but nonetheless did not have reason to know that they didn't have authorization in this particular context. And it's – the government cannot identify any point on a range of sort of – let's go back to the example of the backups. So Mr. Thomas deleted them. Why did he turn off the alert, the point he was making about the alerts? Respond to that. Your Honor, I think that the – They're saying that's proof he knew he didn't have authorization to do all this stuff. Your Honor, I think that that is stretching the evidence in the record. The pagers were disabled the day after there was a power outage in the facility causing several servers to cease to function appropriately. The pagers would have continued alerting everyone else in the sort of technical chain of command of those errors until they were fixed. Mr. Thomas was actively working to fix those problems, and it's common to disable pagers. Mr. Myers testified that if a pager alert went off, then it might wake up his wife in the middle of the night. And so the point is that the person closest to the problem, the person on the ground in the technical infrastructure, which was Mr. Thomas, ought to be taking care of those, and disabling pager alerts just makes sure that nobody else is annoyed when that occurs. I want to correct a couple of misstatements that the government made. The first is with regard to the insider cases that it cited. Every single one of the cases cited by the government as examples where insiders were prosecuted under this statute were cases where the insider's authorization had been explicitly revoked prior to the damage being caused. So in a couple of those cases, and I apologize, though I recognize them, I don't recall which facts are from which case. In a couple of those cases, the person had been terminated or had resigned and then sort of broke into the company's systems and caused damage. In a couple of the other cases, they had planted essentially viruses or time bombs to cause damage intentionally after they had left the company. And so by the time that the damage was caused, they were without authorization at all on the company's systems. And so those aren't examples where an insider who had authorization to cause any damage, some damage, was prosecuted for causing damage from the inside. Turning to this court's opinion in U.S. v. John, John is clearly distinct from this case. This court grappled in John with the question of whether to follow the reasoning of the courts that have applied a limited definition of without authorization in the access cases. But why is this different than all these consent-based crimes, trespass, rape, any number of things in the criminal law that turn on consent? And ultimately it's just a hard call as to whether there was permission. And we just had competing versions of that issue, and the jury made its determination. Why is that wrong? It's wrong for the same reason that a number of courts have held that the statute is simply vague as to without authorization and resolving that ambiguous and resolving that ambiguity in favor of unlimited prosecutorial discretion violates the rule of lenity. That's fine. We made that argument in the brief. Thank you very much.